UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
JOHNSTOWN DIVISION


UNITED STATES OF AMERICA,    )
                             )
                             )      CASE NO:  3:17-MJ-54
        vs.                  )
                             )
                             )
WILLIAM R. DUNBAR,           )
                             )
              Defendant.     )
_____)


TRANSCRIPT OF HEARING ON THE NOTICE OF APPEAL
BY UNITED STATES FROM ORDER OF PRETRIAL RELEASE
AND MOTION FOR DE NOVO HEARING ON ORDER OF RELEASE
BEFORE THE HONORABLE KIM R. GIBSON
OCTOBER 3, 2017

FOR THE GOVERNMENT:
  **Stephanie L. Haines, AUSA**
  United States Attorney's Office
  Penn Traffic Building, Ste. 200
  319 Washington Street
  Johnstown, PA 15901

FOR THE DEFENDANT:
  **Matthew R. Zatko, Esq.**
  202 E. Union Street
  Somerset, PA 15501




        Proceedings recorded by stenography, transcript
produced with computer.
_____
                Kimberly K. Spangler, RPR, RMR
                 United States District Court
                Penn Traffic Building, Ste. 204
                    319 Washington Street
                    Johnstown, PA 15901

```
1                        P R O C E E D I N G S

2        (The proceedings convened on October 3, 2017, commencing at

3    2:07 p.m.)

4                THE COURT:  This is the time and place set for

5    hearing on the notice of appeal by United States from order of

6    pretrial release and motion for de novo hearing on order of

7    release in the case of United States v. William R. Dunbar,

8    Criminal Number 17-54-MJ.

9                Would counsel enter their appearance, please.

10               MS. HAINES:  Stephanie Haines for the United

11   States.

12               MR. ZATKO:  Matthew Zatko on behalf of the

13   defendant, William Dunbar.

14               THE COURT:  Good afternoon to both of you, and to

15   the defendant and to the others present.

16               Attorney Haines, you may proceed.

17               MS. HAINES:  Thank you, Your Honor.

18               As the United States has filed its detention

19   motion, we are predicating the primary reason for the

20   detention of Mr. Dunbar is danger to the community.  We would

21   call Senior Special Agent Keith Heckman to the stand for

22   testimony.

23               THE COURT:  Ms. Spangler, if you would administer

24   the oath, please.

25
```

```
1              SENIOR SPECIAL AGENT KEITH HECKMAN,

2              GOVERNMENT'S WITNESS, SWORN

3                    DIRECT EXAMINATION

4    BY MS. HAINES:

5    Q.    Please state your name for the record.

6    A.    My name is Keith Heckman.

7    Q.    And by whom are you employed?

8    A.    The United States Secret Service.

9    Q.    And how long have you been employed with secret service?

10   A.    I've been employed 21 years.

11   Q.    And you are a senior special agent?

12   A.    I am.

13   Q.    And what is your current duty position?

14   A.    As a senior agent in our Pittsburgh field office.  I

15   oversee counterfeit currency investigations, and am myself an

16   investigator.  And then as the secret service as a dual

17   mission, I also am involved in our protective duties as they

18   arise guarding the president and vice president and others

19   that we protect.

20   Q.    Were you acting in your capacity with the secret service

21   in your protection detail during a recent visit by the vice

22   president of the United States on September 11th of this year?

23   A.    I was.  I was involved as a member of the security

24   advance team in preparation for that visit.

25   Q.    And would you please tell the Court what your duties and
```

1   responsibilities were for the weekend prior to the vice

2   president's visit on the 11th.

3   A.   Yes, ma'am.  During that advance I was assigned the role

4   of intelligence advance agent.  And basically with that I work

5   with federal, state, and local law enforcement entities and

6   other entities looking for and addressing any adverse matters,

7   adverse intelligence that could affect the visit or the safety

8   of the vice president, in that case.  And, you know, included

9   in those things would be direct and indirect threats known to

10  us towards the vice president.

11  Q.   And in that capacity did you become aware of a direct

12  threat that was made against the vice president pending his

13  September 11th visit?

14  A.   Yes, I was.

15  Q.   Please tell the Court what you found out.

16  A.   On the evening of September the 8th I received a phone

17  call from another secret service agent who was in charge of

18  securing the Cambria County Airport.  The Army aviation side

19  of the airport is where the vice president would be arriving

20  by aircraft on 9/11.

21       So the agent securing that venue contacted me and stated

22  that he had just received word from a commander at the Army

23  National Guard that several -- two national guardsmen had

24  reported hearing National Guardsman William Dunbar threaten to

25  kill Vice President Pence.

1   Q.   And were these threats that were directly overheard by

2   the reporting soldiers?

3   A.   They were.

4   Q.   As a result of receiving this information of these

5   threats by Specialist Dunbar, what did you do?

6   A.   That same evening of September 8th, I contacted a

7   commanding officer at the National Guard base, introduced

8   myself, and he basically reiterated the same information the

9   secret service agent had forwarded to me.  The commander

10  identified the guardsman in question as William Dunbar, and I

11  proceeded to make arrangements with that commander to

12  interview witnesses and Mr. Dunbar the following morning.

13  Q.   And did you do that?

14  A.   I did.  I arrived on the base the morning of September

15  the 9th and conducted interviews.

16  Q.   And did you have the opportunity to interview individuals

17  who directly heard the threats made by Mr. Dunbar?

18  A.   Yes, I did.

19  Q.   How many people in total did you interview?

20  A.   Three.

21  Q.   Did all three of these individuals hear directly from

22  Mr. Dunbar's mouth threats against the vice president?

23  A.   Yes.

24  Q.   What did these three individuals -- well, let me ask you

25  this:  Were these three individuals also soldiers in the Army

1   Guard unit?

2   A.    Yes.

3   Q.    Did they describe their relationship that they had with

4   Specialist Dunbar as enemies or friends of his?

5   A.    Not enemies.  More of a friendly relationship.

6   Q.    What did they tell you about what he said?

7   A.    Okay.  Yes, they -- in all three instances each witness

8   said they heard him say he would or will kill Vice President

9   Pence.

10  Q.    Did they tell you, "Ah, Dunbar's funny like this, he

11  tells jokes," or were they very serious and concerned about

12  it?

13  A.    They were very serious and concerned about the statements

14  that were made.

15        And I asked that question.  I asked, you know, is this --

16  did you kind of perceive this as a joke?  No, this scared us a

17  little.  One particular witness kind of a quote that this

18  scared me.

19  Q.    Did they explain to you why they were scared by these

20  type of statements by a fellow soldier?

21  A.    Well, because they know him, they have been -- him being

22  Mr. Dunbar -- they've been around him.  They have seen

23  volatility, anger issues, lashing out.  And I think their

24  experience with him suggested to them this is something to be

25  concerned about and to report it.

1  Q.    Now, you stated that these were individuals who knew him

2  in his capacity at the Army National Guard base.

3  A.    Yes.

4  Q.    And you questioned them about their past interactions

5  with him?

6  A.    I did.

7  Q.    Did any of them give specific details as to volatile

8  actions by him that scared them?

9  A.    So there was knowledge presented to me that in the past

10 year, during 2017, there were two instances where Mr. Dunbar

11 had voiced suicidal ideation.  Those concerns were brought to

12 command personnel, and then Mr. Dunbar was referred to

13 National Guard counseling with relation to that.  And I --

14 obviously, there was a concern there on the part of the

15 national guardsmen.

16     Also, there were instances where outside of duty weekends

17 there was information put forth where Mr. Dunbar had acted in

18 a concerning capacity.

19 Q.    In what specific ways were you told?

20 A.    One specific example would be, you know, a witness was

21 aware that Mr. Dunbar got into a fight with a college student

22 at an area university, a fistfight type of fight, and alluded

23 to a gun being in his car, alluded to potentially using the

24 gun in relation to the fight, and just knowledge that the gun

25 is frequently -- or has been seen in the car in the past.

1  Q.   Did these individuals voice their concerns or their fear

2  of Mr. Dunbar?

3  A.   Yes.  On that date of the interviews each witness

4  expressed concern to me and to the police officers and the

5  command personnel present, they voiced concern for their

6  safety in retaliation of -- for being a witness.

7  Q.   And did they base that fear of retaliation on their

8  knowledge of the short-tempered and anger issues of Mr. Dunbar

9  that they personally witnessed in the past?

10  A.   Yes.

11  Q.   Now, did you also have the opportunity to discuss

12  Mr. Dunbar with what is known in the military as

13  noncommissioned officers or senior sergeants, people that were

14  a little older and more experienced in the military?

15  A.   Yes.

16  Q.   And did you have the opportunity to talk to a few NCOs

17  about what they know of Mr. Dunbar?

18  A.   Yes, I did.

19  Q.   And what did those NCOs tell you?

20  A.   They recounted the same information, generally speaking,

21  regarding the notions of suicide that had been previously

22  addressed.  I believe in June of 2017, after some counseling

23  related to the suicidal ideation, the military put into place

24  a restriction for Mr. Dunbar wherein he is not allowed to have

25  access to firearms on the base.

1  Q.    And was that based on suicidal ideations of Mr. Dunbar,

2  or what was that based on?

3  A.    So in continuing to talk with these NCOs, there had been

4  a pattern, a history of -- it was described to me as "roid

5  rage," as in someone who would use illegal steroids, and just

6  go into a rage fairly quickly.  And that that behavior was

7  seen somewhat regularly, or with some commonalty while he was

8  on the base.  And that resulted in smashing things, breaking

9  things, throwing things.

10        And so just for the safety of Mr. Dunbar and for the

11  physical safety of other national guardsmen and other people

12  on the base, you know, they removed his access to weapons.

13        And then also around June of 2017 basically isolated him

14  on base to where he was by himself, but under the supervision

15  of one particular NCO.  And that again was for his safety and

16  to ensure that he didn't harm -- out of rage and anger -- harm

17  other guardsmen.

18  Q.    Okay.  Now, you described NCOs called it "roid rage."

19  Now, they weren't suggesting basically he's on steroids, they

20  just used that as a term to qualify his volatility or his

21  violent outbursts; is that correct?

22  A.    Yes.  No suggestion implied that he was taking steroids,

23  but just that his quickness to anger would resemble someone

24  who was taking that drug.

25  Q.    And that was one of the bases that they restricted him

1    from arming and restricted him from being around other

2    soldiers?

3    A.    Yes, that's correct.

4    Q.    In talking with the military then and up until now, have

5    they continued to inform you of their fears or trepidations

6    about Mr. Dunbar?

7    A.    They have.  And I was informed that at the point where

8    local charges had been filed against Mr. Dunbar were dropped

9    that the witnesses and/or family of the witnesses contacted

10   the NCOs, as well as a particular sergeant on the base,

11   contacted the NCOs out of safety concerns what they believe

12   that he -- that the charges were dropped and that he may be

13   released.

14   Q.    And were these safety concerns for the safety of

15   Mr. Dunbar hurting himself or safety concerns for themselves

16   who have come forward?

17   A.    They were concerns for themselves who have come forward.

18   Q.    And it was based upon their knowledge and experiences

19   with Mr. Dunbar in the past?

20   A.    Yes.

21   Q.    After you interviewed the witnesses that heard the direct

22   threats made by Mr. Dunbar, did you also have the opportunity

23   to interview Mr. Dunbar?

24   A.    I did.

25   Q.    Okay.  Let me get a little background from you.  So you

1    said you've been a special agent with secret service for 21

2    years.

3    A.    That's correct.

4    Q.    How many times in the past have you interviewed or been

5    part of an investigation on someone who has made direct

6    threats against secret service protectees?

7    A.    This is a critical part of our job.  I would estimate

8    that at least a hundred times in my career I've had interviews

9    related to this.

10   Q.    And obviously a critical part of that is making a

11   possible determination on the safety and security of the

12   protectee; is that correct?

13   A.    Yes.

14   Q.    Is also part of your job to make an assessment of the

15   danger that this target poses to the community at large?

16   A.    Absolutely.

17   Q.    When you were conducting your interview with Mr. Dunbar,

18   were both of those roles, safety and security of the vice

19   president as well as safety and security of the community at

20   large, tantamount to the interview you were conducting with

21   him?

22   A.    Yes.

23   Q.    Please tell the Court how that interview went.

24   A.    Mr. Dunbar was brought into a room where I was already

25   seated.  We met and sat down.  Mr. Dunbar was advised of his

1   Miranda warnings before any questions were asked.  Mr. Dunbar

2   signed the -- read and signed the Miranda and waiver form, so

3   the interview began.

4        And generally I'll start out with a basic question is,

5   "You know, sir, we're here with the understanding that you

6   made a threat against the vice president.  Can you tell me

7   what you said yesterday."  And Mr. Dunbar started out

8   appearing confused and uncertain as to, you know, why we're

9   asking him this, but he said, "I don't recall making any sort

10  of statement like that."

11       And you know, in -- he kind of maintained that position

12  for a while as we continued speaking.  As questioning

13  continued, that answer then evolved into a different answer in

14  which Mr. Dunbar said, "Well, what I said yesterday was words

15  to the effect of 'this would be the perfect opportunity for

16  someone to do something.'"  I then said, "Well, sir, what do

17  something -- you know, what is something?"  And he said,

18  "Assassinate or kidnap the vice president."  I said okay, but

19  he then said, "That was a joke."  I said, "That isn't a joke."

20       I questioned him as to where the humor was in that

21  statement or why that would be something to call a joke when

22  it's simply an observation of fact.  And I questioned the

23  veracity of what he was telling me.  And he maintained that

24  position and that answer for some time, and at which point I

25  just changed the subject and I asked him about him.

1   Q.   And did he start telling you about himself?

2   A.   He did.  I approached -- he did.  I, I believe I asked

3   him how he was doing, how he was feeling, something along

4   those lines.  And he'd recounted a number of issues in his

5   personal life that, quite honestly, were that -- you know, are

6   not good that he's dealing with.

7        And I asked him if he was at this moment feeling thoughts

8   of suicide, depression, that sort of thing.  And he said, "No,

9   I haven't really felt suicidal since June of this year, but

10  none of this helps."

11  Q.   Did he talk to you about past instances he had had with

12  the law?

13  A.   So at that point -- he had become emotional during that

14  part of our conversation, and the folks from the National

15  Guard kind of said let's take a break.  So a break was taken

16  in the interview, maybe 10 or 15 minutes, and Mr. Dunbar left

17  the room.  He was escorted -- I do not know where they went --

18  some other room.

19  Q.   And when the NCOs escorted him back to you, did the NCOs

20  relay to you information as to what occurred in their presence

21  with Mr. Dunbar?

22  A.   Yes.  They came back without Mr. Dunbar and said,

23  "Listen, Agent Heckman, Mr. Dunbar just said to us, 'Here's

24  that -- that what he said the day before was that I will kill

25  the vice president if someone paid us enough -- paid me enough

1   money.'"  And I said okay.

2   Q.    Did you ever learn who he defined would pay him enough

3   money would have him attempt to kill the vice president?

4   A.    Yes.  So as that notion progressed and then was brought

5   back and the interview continued, some clarification went on

6   that like another country.  So if I was paid enough money by

7   another country.  And so we kind of got that established now

8   as his third answer as to what he had actually said the day

9   before.

10        And I honestly didn't believe that that is what he said

11   the day before.  However, I did ask him then -- moved on a

12   little bit to his criminal history.  I said, "Well, have you

13   been in trouble before?"

14   Q.    And what did he tell you?

15   A.    He said, you know, as an adult there was a road rage

16   incident, but nothing -- nothing beyond that.  And then he

17   said that as a younger person around age 14 that he was

18   arrested and charged with rape.

19   Q.    Did he detail for you what that involved?

20   A.    He did.  He indicated that the -- the charge occurred and

21   it was ultimately pled down to a lesser charge, and that the

22   charges -- the rape charge stemmed from the -- the accusation

23   was that he had tied his cousin to a tree and raped her while

24   tied to the tree.

25   Q.    And did he explain to you how the rape charge was pled

1    down to the indecent assault in this situation?

2    A.    What he said to me was that "This is what the charge was,

3    but my attorney had a real good defense, is that this girl

4    weighed -- was heavy.  She was a heavy girl.  And she weighed

5    more than, at that age of my weight, than I could have --

6    could have done.  I couldn't have tied her up because she

7    weighed more than me, and I couldn't have physically done that

8    so, therefore, you know, I had a good defense."

9    Q.    And he pled it down to an indecent assault?

10   A.    That's correct.

11   Q.    Did he tell you or did you come to learn what or how he

12   was in a school setting?  Was he a good student?  Did he have

13   problems?

14   A.    So what I understand is that there had been issues going

15   back for a long time in his life, and that during the high

16   school years there was a lot of fighting.  He was placed into

17   actually two different schools for I guess troubled youth or

18   misbehaved youth in high school.  Had one -- one of those

19   placements in school may have stemmed from an incident, by way

20   of example, where he had thrown a rock at a girl's head, and

21   another student kind of interceded to defend the girl and

22   break things up and he fought then with that student.  So

23   there were definitely fighting issues, temperament issues

24   during high school.

25         I've also learned that there were -- there was at least

1    one incident of a suicidal notion during high school where

2    Mr. Dunbar had a knife and may have cut himself in relation to

3    the suicide threat.  So there's definitely a kind of

4    historical pattern of concern here.

5    Q.   Did you have a discussion with Mr. Dunbar when you were

6    interviewing him as to where he resides?

7    A.   I did.

8    Q.   Okay.  What did he tell you?

9    A.   Mr. Dunbar said that he had an apartment at a location in

10   Berlin, provided like a cross street location -- not an

11   address -- but that he wasn't currently living at that

12   apartment.  He was living with a girlfriend in Maryland at her

13   residence, and was not able to tell me the address for that

14   residence.

15   Q.   The address in Berlin, was he able to describe it in

16   enough fashion so that we were able to find out where that

17   actual place was?

18   A.   Yes.

19   Q.   And were we able to go in and search that residence?

20   A.   Yes.

21   Q.   And what was found at the residence that Mr. Dunbar

22   vaguely identified as a place where he resides?

23   A.   There were five firearms in that residence.

24   Q.   And what type of firearms were there?

25   A.   There was a handgun, a shotgun, an AR-15, and two deer

1    rifles.

2    Q.    Since the September 26th detention hearing that we had

3    here in court, has the investigation of Mr. Dunbar continued?

4    A.    Yes, it has.

5    Q.    Have you had the opportunity to interview additional

6    individuals relative to Mr. Dunbar and his past and his

7    current behavior and characteristics?

8    A.    Yes.

9    Q.    Were you able to talk with military personnel specific to

10   any psychological testing that had gone on?

11   A.    Yes.

12   Q.    And did that individual relay to you reasons why

13   Mr. Dunbar was prohibited from arming on the post?

14   A.    Yes.

15   Q.    And did those reasons predate the September 11th threat

16   against the vice president?

17   A.    Yes.

18   Q.    And what were you told as to -- from this recent

19   interview from a military psychologist as to the current

20   status of Mr. Dunbar?

21   A.    Well, I just simply asked for clarification.  The reason

22   why there was a restriction from firearms that stemmed from

23   counseling following a suicidal ideation to explain, you know,

24   at least in general terms, if there's going to be a guardsman

25   restricted from firearms why would you restrict a guardsman

1   from firearms.

2       And the answer was, "Well, A, so that they did not hurt

3   themselves but, B, so that they did not hurt anyone else on

4   the base."

5   Q.   And that was a concern with Mr. Dunbar, that he didn't

6   hurt anyone else?

7   A.   Yes.

8   Q.   And this was from the military psychological department,

9   which is also in addition to the NCOs who told you the same

10  thing?

11  A.   Yes.

12  Q.   Did you have the opportunity since the last detention

13  hearing to also conduct interviews of community members who

14  know and have been around Mr. Dunbar for years?

15  A.   Yes.

16  Q.   And what did you learn from community members who have

17  known him for the last several years?

18  A.   Well, I learned a lot.  I -- the common first statement

19  that I think generalizing this would be, you know, extreme

20  anger, extreme volatility.  The ability to go, as I mentioned

21  earlier, from 0 to 100 on the anger scale so quickly, and then

22  come down from that so quickly into almost a depressive state

23  of mind.  That the imbalance there made it such that people

24  don't know what's going to happen next.  That's the general

25  sense I would hear over and over.

1  Q.   And were they concerned like what would happen next as to

2  what he would say to people or what he would do to people?

3  A.   Both.

4  Q.   Did these community members voice concern or fear of

5  Mr. Dunbar?

6  A.   They did.

7  Q.   Did some of these community members actually detail for

8  you instances where they had been physically harmed by

9  Mr. Dunbar?

10  A.   I received information where Mr. Dunbar had hurt people,

11  and I don't mean a punch in the face.  I mean hospitalization

12  required.

13      I have also heard information where, verbally at least,

14  there were intimations of firearms, or firearms had been

15  brandished.  And in one instance -- in every instance there

16  were concerns voiced to me if comments were made to me would

17  retaliation occur.  It was a common concern.  One potential

18  witness simply said they would not speak to me because in

19  their words, "Mr. Dunbar is a live wire, and there will be

20  retaliation, and I will not speak to you."

21  Q.   And that's based upon what this witness knows and has

22  experienced by Mr. Dunbar?

23  A.   There is correct.

24  Q.   Did you also have the opportunity to talk to any family

25  members of Mr. Dunbar?

1  A.    I did.

2  Q.    And what information did you receive from the family

3  members?

4  A.    Essentially that Mr. Dunbar is all talk, no action; that

5  he is angry, quick to anger but that that translates into, you

6  know, verbal exchanges, not physical exchanges.  And, however,

7  that he is -- the quote was "not right in the head and could

8  use some help, needs help."

9  Q.    Now, we talked earlier about in your training and

10 experience with your 21 years that you assess these type of

11 targets for danger to the protectee and then also danger to

12 the community.

13       Could you tell the Court, based upon the investigation

14 you had to date and the interviews you conducted, the

15 assessment you've made, Senior Special Agent Heckman.

16 A.    Absolutely.  My conclusion at this point regarding

17 Mr. Dunbar's position as a threat to the community in terms of

18 people that are associated with this investigation, yes,

19 absolutely I am concerned that he poses a threat or a risk of

20 harm.

21       With regard to my official secret service investigation

22 of harm torwards protectees of the secret service, I have not

23 drawn a conclusion.

24            MS. HAINES:  No further questions, Your Honor.

25            THE COURT:  Attorney Zatko.

1    MR. ZATKO:  Yes, sir.

2    CROSS-EXAMINATION

3  BY MR. ZATKO:

4  Q.  Special Agent Heckman, would you please tell me precisely

5  what the three interviews, or the three witnesses from the

6  base told you Mr. Dunbar said.  What precisely was the threat?

7  A.   Okay.  The first witness said, with a slight preference

8  here to what they said, the first witness saw the second

9  witness reacting to something Mr. Dunbar said.  The first

10  witness then paid attention, moved closer to the conversation

11  and heard Mr. Dunbar say, "I'll kill the vice president or

12  I'll kill the VP."

13  Q.   Okay.

14  A.   The second witness said that they heard Mr. Dunbar say

15  "I'd kill the VP or the vice president."  And then on the

16  second occasion heard the same thing.

17      The third witness was much more specific.  I found this

18  third witness especially credible -- all of this was credible,

19  but the third witness especially credible.  She immediately

20  was able to recite what she recalled hearing the day before.

21  She said that Mr. Dunbar said, "F the VP."  Using a curse

22  word.  "I'll make a terroristic threat, I'll kill him.  I

23  don't give a" -- S word -- "there's nothing they're going to

24  do."

25  Q.   But Dunbar told you he made this statement conditionally;

1    if someone did something then I would, or this would be the

2    perfect opportunity to do something, correct?

3    A.    He said both of those things.

4    Q.    Understood.

5          But those were his statements?

6    A.    Yes.

7    Q.    He did not say to you, I said I'd kill the vice

8    president.  He said, I may have said if somebody did

9    something, North Korea paid me enough money then maybe or then

10   I would?

11   A.    You are correct.

12   Q.    And the statement about "this would be the perfect

13   opportunity" was in reference to the fact that Vice President

14   Pence was going to be arriving on Monday?

15   A.    Yes.

16   Q.    Was Dunbar even scheduled to be on base on Monday?

17   A.    I don't know.

18   Q.    Would it surprise you to know that it was a drill weekend

19   which was Friday, Saturday, Sunday?

20   A.    I knew it was a drill weekend, sir.  I don't know if that

21   entails, you know, a Monday or not.

22   Q.    Don't you think it would be important to know if he was

23   making these threats, and based on your belief that he was

24   potentially going to act on it, whether or not he was even

25   going to be on base when the VP got there?

1   A.   Not when he lives only a matter of miles from the base.

2   Q.   You indicated that the -- there were two instances of

3   suicidal ideations.

4   A.   As reported to me, yes, sir.

5   Q.   Was it reported to you that he had threatened any of his

6   fellow soldiers?

7   A.   Not that I can recall.

8   Q.   Was it reported to you that he had threatened any of his

9   superiors?

10  A.   No.

11  Q.   But rather, that he had perhaps made threats against

12  himself?

13  A.   Yes.

14  Q.   There's a concern because Mr. Dunbar may have been in a

15  fight at a college campus and he alluded to having a gun in

16  his car.

17  A.   Yes.

18  Q.   Did your witness indicate to you that he ever saw that

19  gun at the time of this altercation?

20  A.   The witness indicated the gun was in the car.   The

21  witness saw the gun in the car.   I cannot state that the

22  witness saw the gun at the physical location of the

23  altercation --

24  Q.   The witness wasn't even a witness to the fight.   This was

25  something that the witness testified to that had happened in

1   the past?

2   A.   As I understand it, the witness was present for the

3   fight.

4   Q.   But he doesn't know if the gun was in the car?

5   A.   He clarified that the gun was in the car.

6   Q.   Did Dunbar ever pull a gun or anything like that?

7   A.   On that date?

8   Q.   Yeah.

9   A.   At that fight, not to my knowledge.

10  Q.   In fact, you don't have any reports of anyone saying they

11  were ever threatened by William Dunbar with a firearm, that he

12  ever pointed a firearm at anyone?

13  A.   That would be incorrect.

14  Q.   My statement was incorrect or your statement was

15  incorrect?

16  A.   Your statement.

17  Q.   Okay.  So you're saying there's some person out there

18  claiming Dunbar pulled a gun on them?

19  A.   Yes.

20  Q.   We got no criminal record of that, correct?

21  A.   Correct.

22  Q.   We have no police report of that.

23  A.   That I know of at this time, correct.

24  Q.   Dunbar was -- well, you certainly pulled his criminal

25  record, did you not?

```
 1    A.    I did.

 2    Q.    You found nothing in his criminal record to indicate that

 3    anyone had ever charged him with pointing a firearm at anyone?

 4    A.    That's correct.

 5    Q.    These fellow soldiers keep talking about this fear of

 6    retaliation, yet nothing in his disciplinary file at the Guard

 7    indicated that he threatened other soldiers.

 8    A.    I have not seen anything that is a direct threat to

 9    another soldier, correct.

10    Q.    In fact, the suicidal ideations that you refer to were

11    reported to the chain of command by another soldier, were they

12    not?

13    A.    Yes.

14    Q.    And that soldier wasn't retaliated against for making

15    that referral.

16    A.    He was not retaliated for trying to get Mr. Dunbar some

17    help.

18    Q.    Wasn't threatened.

19    A.    Well --

20    Q.    Correct?

21    A.    He was not threatened, that's correct.

22    Q.    You indicate you questioned Mr. Dunbar about his past

23    run-ins with the law.

24    A.    I did.

25    Q.    Let's talk about his past run-ins.
```

1    A.    Okay.

2    Q.    You'll agree with me that in November of 2008, when

3    Mr. Dunbar was 14 years old, he was charged with misdemeanor

4    indecent assault, felony rape, a second count of misdemeanor

5    indecent assault.  And the ultimate disposition was one count

6    of indecent assault and one count of rape was dismissed, and

7    he was adjudicated delinquent solely on the misdemeanor

8    indecent assault; is that correct?

9    A.    That sounds accurate.

10   Q.    Then in 2013, at the age of 18, he was charged with a

11   summary offense of disorderly conduct and he pled guilty.

12   A.    That's correct.

13   Q.    In 2015 he was charged with a summary offense and he pled

14   guilty.

15   A.    Correct.

16   Q.    It was another summary disorderly conduct, I'm sorry.

17   A.    Well, yes.  Sorry.

18   Q.    In 2016 he was charged with a summary offense of

19   harassment and was found not guilty.

20   A.    I saw a disposition to that effect.  I have not looked

21   into that incident, sir.

22   Q.    And aside from then two summary convictions and a

23   misdemeanor juvenile conviction -- or juvenile adjudication --

24   aside from these charges there's absolutely nothing else on

25   Mr. Dunbar's record.

```
 1   A.   I would agree.
 2   Q.   So your interviews of this, for lack of a better term,
 3   volcanic-type personality, someone who routinely goes around
 4   threatening people, pointing guns at people, has the entire
 5   community in fear of him, the criminal record doesn't exactly
 6   back that up, does it?
 7   A.   Part also of my job involves completing the background
 8   investigation when we hire secret service agents.  Part of
 9   that process involves a polygraph examination.  We do that
10   specifically to find out more than what a criminal record
11   tells us.
12        People's actions, apart from any criminal record, are
13   important as what's on paper or what's been charged.  Okay, so
14   I take seriously information that I learn from the community,
15   whether it is reflected as criminal charges on arrest records
16   or not, sir.
17   Q.   But you're portraying this guy basically as a monster in
18   this community; everybody's afraid of him, nobody wants to
19   talk about him for fear of retaliation.  Yet, he doesn't have
20   a single crime of violence on his criminal record, correct?
21   A.   He does not, other than the ones already discussed.  And
22   I am not attempting to make a portrayal.  I'm simply reporting
23   what others have told me.
24   Q.   You talk about him going to special schools for troubled
25   students.  Can you tell me the names of those schools, please.
```

1    A.   At this point I can only tell you the city.  I cannot

2    tell you the names of the schools.

3    Q.   Okay.  What are the cities?

4    A.   Bedford, PA and Everett, PA.

5    Q.   Well, my understanding is that Mr. Dunbar attended

6    kindergarten through tenth grade in Berlin, Pennsylvania, at

7    Berlin High School.  In eleventh grade he moved in to take

8    care of his great grandmother in Salisbury, Pennsylvania, and

9    attended school there.  And for his senior year he went to

10   live with a relative in Meyersdale, and that's where he

11   actually graduated from high school.  Those three schools are

12   all Somerset County public schools, not exactly reform

13   schools.

14       Where did you get the information about him going to

15   school in Bedford?

16   A.   As part of my witness interviews that would have come

17   out.  If it was mistaken, it was mistaken information.  I'm

18   just reporting what I was told.

19   Q.   You have concerns about Mr. Dunbar being forthcoming

20   about his residence because he didn't know the address to

21   those residences.

22   A.   Correct.

23   Q.   But Attorney Haines asked you if you were able, based on

24   his description of where the residence was, you certainly were

25   able to find it, correct?

1   A.   Yes.

2   Q.   And you'll agree with me that the guns he told you were

3   in the residence were, in fact, in the residence?

4   A.   Yes.

5   Q.   He told you about those long before you ever got there?

6   A.   Correct.

7   Q.   As part of your visit to his residence and as part of

8   your investigation, you certainly combed through the contents

9   of his residence?

10  A.   Law enforcement -- I personally did not.  Law enforcement

11  present did, yes.

12  Q.   And you had the opportunity to discuss with them what

13  their findings were?

14  A.   Correct.

15  Q.   Was there anything at all found in Mr. Dunbar's residence

16  to indicate or support this notion that he was going to harm

17  either the vice president of the United States, or anyone else

18  for that matter?

19  A.   There were knives, a few things that were not removed,

20  obviously five serious weapons.  Nothing beyond those.

21  Q.   All five weapons legally obtained.

22  A.   I'm awaiting confirmation, but it would appear at this

23  point, yes.

24  Q.   None of the weapons came up stolen, did they?

25  A.   Not to my knowledge.

1   Q.   Certainly not illegal to own knives, is it?

2   A.   No.

3   Q.   But again, you didn't find a to-do list to kill the vice

4   president or some type of schedule or plan or even -- was

5   there a computer found in the residence?

6   A.   I don't think that there was.

7   Q.   Did you search his cell phone?

8   A.   No.

9   Q.   Are you aware of any searches or online attempts by

10  Mr. Dunbar to elicit any additional information about the vice

11  president or his whereabouts or anything like that?

12  A.   Not at this time.

13  Q.   You testified that the psychologist told you that

14  Mr. Dunbar was not allowed to have firearms, not just because

15  he had threatened harm to himself but that he possibly was a

16  danger to others around him.

17  A.   Yes.

18  Q.   And as a result of that they took his gun away, his

19  service weapon.

20  A.   Yes.

21  Q.   But they didn't prohibit him from coming to the base or

22  drilling with his unit, did they?

23  A.   No.

24  Q.   So the concern or the fear was, If he doesn't have a

25  weapon he can still be part of his unit?

1    A.    Isolated and supervised, yes.

2    Q.    So the threat was not severe enough to keep him off base,

3    or the concern was not severe enough to keep him off base,

4    correct?

5    A.    I hate to speak for the National Guard, but it's

6    apparent.

7    Q.    I think we can let the facts speak for themselves.

8          These interviews, these people who I can only presume are

9    not present today, but people who say that Mr. Dunbar attacked

10   someone so violently they had to be hospitalized.

11         Again, any supporting documentation of that?  A hospital

12   record?  A police report?  Anything other than what somebody

13   apparently told you?

14   A.    Not at this time.

15   Q.    Any suggestion of how old Mr. Dunbar was or when did that

16   happen or where did it happen?

17   A.    I have some of that information, yes, all pending -- but

18   again --

19   Q.    I'm sorry.

20   A.    All pending --

21   Q.    But again, no criminal charges, no call to the police,

22   nothing to substantiate what this person's telling you?

23   A.    Pending further investigation, my answer is that you are

24   correct.

25   Q.    It came to my attention earlier that one of your concerns

1   if Mr. Dunbar is released to his grandparents pursuant to the

2   home plan is that there may be some relative residing there

3   that has a criminal record.

4   A.   Initially that had been brought to my attention.  I

5   believe that had been discounted.

6   Q.   Okay.  So Roger Most, Jr. is not a concern regarding

7   Mr. Dunbar's home plan?

8   A.   I'm conducting a lot of investigation in a short period

9   of time.  I have learned that it is -- it's not confirmed to

10  me, but I believe he may be deceased.

11  Q.   That was going to be my question.  It's my understanding

12  he died eight years ago.

13  A.   I recently discovered that, yes, sir.

14  Q.   You focused your testimony today strictly on danger to

15  the community.  You'll agree with me that Mr. Dunbar is not a

16  flight risk, correct?

17  A.   I don't know how to answer that, sir.  I don't know.

18  Q.   You've done an investigation.  He doesn't have a

19  passport, correct?

20  A.   Correct.

21  Q.   It's your understanding -- or is it your understanding

22  that he has resided in Western Pennsylvania, more specifically

23  Somerset County, his entire life?

24  A.   Yes.

25  Q.   Doesn't seem to have contacts outside the state, let

1   alone outside the country.

2   A.   Other than a contact in Maryland, correct.

3   Q.   He had a job in Maryland but Somerset County was -- it's

4   above Maryland.

5   A.   I understand.

6   Q.   You haven't discovered anything that he's ever failed to

7   appear for, any even of his summary cases, that he's never

8   failed to appear for court, correct?

9   A.   That's correct.

10  Q.   Finally, in your interviews with Mr. Dunbar's family, no

11  one in his family has indicated to you that they're afraid of

12  him.

13  A.   Correct.

14  Q.   In fact, it was the "all talk, no action" is what they

15  referred to it as?

16  A.   Yes.

17  Q.   His grandparents have indicated they are happy and

18  willing to have him come reside with them if released?

19  A.   That is my understanding.

20           MR. ZATKO:  That's all I have.  Thank you, sir.

21           THE WITNESS:  Thank you.

22           THE COURT:  Attorney Haines.

23           MS. HAINES:  I don't have anything, Your Honor.

24           THE COURT:  You may step down, sir.

25           THE WITNESS:  Thanks, Your Honor.

```
1          THE COURT:  Attorney Haines, I will hear argument

2     with regard to the issue of detention or release and, in

3     particular, I ask that you direct your arguments to the 18

4     United States Code, Section 3142(g) factors.

5          MS. HAINES:  If I may have a moment to pull those

6     so I can directly address those.

7          Looking specifically about the nature and

8     circumstances of the offense charged, including whether the

9     offense is a crime of violence, a federal crime of terrorism

10    or a minor victim of a controlled substance, firearm,

11    explosive, or destructive device, basically you've heard the

12    nature and circumstances of the offense, Your Honor.  The

13    threat against the vice president of the United States is the

14    crux of the complaint, and the charge in the complaint that's

15    pending currently.

16          You had heard the witness tell and state how three

17    different witnesses who directly heard statements made by the

18    defendant in direct threats against the vice president.  "I

19    will kill the vice president."

20          You heard the third witness, who our witness today

21    talked about how very explicitly Mr. Dunbar stated what he

22    intended to do to the vice president.  From the basis of what

23    you heard of the offense charged, the elements that a threat

24    was made, you've heard that evidence here today.

25          The weight of the evidence against the person,
```

1    against Mr. Dunbar, is another factor.  You heard that we have

2    three witnesses who directly heard the statements made right

3    from the mouth of the defendant.  You also heard that when

4    given a vague location of where Mr. Dunbar resided, federal

5    law enforcement was able to retrieve from Mr. Dunbar five

6    different firearms that were located.

7         The defense counsel said, Was there anything else

8    in the apartment to make you believe that Mr. Dunbar could or

9    would carry out that threat against the vice president.  You

10   heard the witness state, Well, there were some knives present,

11   but there were five serious, high -- I think he called them

12   high powered or obviously serious firearms.  And that this man

13   resided just a short distance from the base when they were

14   retrieved.

15        The history and characteristics of the person is

16   the next factor to talk about.  And you heard a lot of

17   information and evidence, Your Honor, from what I would call

18   basically three different types of persons who are aware of

19   this defendant.

20        You heard evidence from military personnel that

21   were interviewed and spoke with our agent.  They told you

22   about the volatility of this defendant from not just the

23   weekend of the vice president's visit, but predates that

24   visit.  He's short tempered, he's quick to anger, he flies off

25   the handle, he's known to throw things, be violent with

others.  The military had to take such actions as to disarm

him, not only for his own protection based upon suicidal

ideations that this defendant has voiced during his military

service, but as was reiterated by noncommissioned officers, as

well as by the military psychologist that this military

soldier was prohibited from arming as a result of the fear

that was known and the threat that was posed by this person to

other members at the military installation.

They also felt compelled to not only disarm him and

not allow him to draw weapons, but during drill status weekend

he was required to be isolated, monitored, and escorted at all

times.  Once again, not only based on his suicidal ideations,

but the fear of his likelihood of committing harm or

perpetrating some type of violent act against other soldiers

on that base.  They talked that this had been something that

just didn't happen, that this was sort of a long-standing

event.  That's from the military.

You also heard the agent talk about the military

witnesses that were very fearful, but felt compelled to come

forward and say this is what Dunbar said he was going to do to

the vice president.  We're afraid of him because we know him.

We know how he acts.  We don't know what he is capable of, but

they felt that they needed to come forward, but continue to

this day to say how afraid they are of Mr. Dunbar based upon

the characteristics of him.

 1          Talking about also his physical and mental

 2   condition, you also heard our witness testify to his

 3   interviews with the community, that he went out and

 4   interviewed people who have known Mr. Dunbar, who have lived

 5   in the community with Mr. Dunbar.  And he recited to you and

 6   to the Court what he learned about prior instances of

 7   brandishing a weapon, intimating threats of use of a weapon,

 8   harming an individual to the point of hospitalization, that

 9   members of the community -- once again, he's short tempered,

10   he's volatile, he acts out very quickly, we are afraid of him,

11   we don't know what he is capable of.

12          The other circumstances were when the secret

13   service agent talked to a family member who, understandably,

14   would be deferential to his family member but did still state

15   I think the quote was "he's messed up in the head, he needs

16   help."

17          When you're talking about these type of factors to

18   look at, the weight of the evidence, the nature of the

19   evidence based upon three eyewitness statements who actually

20   heard the direct threats made by him, and the detailed

21   chronology of the past and the current behavior of this

22   defendant who has been known for quite some time, dating back

23   to high school years where he was known to get into fights, he

24   has a juvenile conviction.

25          And I understand the downplaying by the defense of

1    his criminal history.  The United States sees it in a

2    different way, Your Honor.  We have a 22-year-old man who,

3    granted, he does not have the felony convictions that maybe

4    some others would have.  But we have a young man sitting

5    before us who has some very serious red flags over the last

6    several years, and we live in a world where these red flags

7    cannot be ignored.

8           We have a juvenile conviction.  He described --

9    Mr. Dunbar described this juvenile conviction to secret

10   service, "I was charged with rape but it ultimately got pled

11   down to an indecent assault because I supposedly raped my

12   cousin on a tree, but she was too heavy and that couldn't have

13   happened."

14          The United States sees that as a concerning start

15   to this young man's recitation of his past.  We have that

16   conviction.  We also have more recent disorderly conduct

17   convictions.  He talked to the secret service agent about the

18   road rage incident that has his license suspended.  We now

19   have him in very graphic terms displaying threats to the

20   United States.

21          So, yes, he does not have a long list of felonies,

22   but he definitely over of the last several years has been

23   engaging in very concerning, disturbing, volatile conduct that

24   appears potentially to be escalating.

25          We have a community, not only a military community,

1    but a community in Somerset County that is detailed to the

2    secret service agent, specific acts of volatility, as well as

3    their continued fear of coming forward and their fear of

4    retaliation.

5            Now, as the secret service agent so eloquently

6    said, I don't just take what's on paper, a criminal history

7    that's on paper.  I take and assess what I also hear from the

8    community that he lives in, the people he works with, the

9    people he's around, and I take that into serious consideration

10   when I'm doing an assessment.

11           You heard it from the secret service agent with 21

12   years of experience that when he was done his assessment of

13   this defendant that he has serious concerns for the safety of

14   the community that Mr. Dunbar would return to, based upon the

15   investigation to date.

16           We are asking that he be detained, Your Honor,

17   based on danger to the community, on what you've heard.  In

18   the alternative, we would request this Court to consider, if

19   appropriate in the Court's eyes, we would request the Court to

20   order an immediate psych evaluation, either by a local

21   psychiatrist or by the federal correctional institution at

22   Butler who could do a full, intensive mental workup on this

23   defendant.  So that if there were such terms and conditions

24   that could be established by this defendant, we would have a

25   professional in the federal system, either a local

1  psychiatrist or a psychiatrist at Butler make that decision to

2  further educate the Court, as well as the parties.  We would

3  ask that it be immediate.

4         We would ask that Mr. Dunbar be detained until that

5  immediate psych evaluation could be done and completed and a

6  report given both to the Court and the United States and to

7  the defense.

8         As an alternative, to basically assess the mental

9  status and the mental health of this man who, in the eyes of

10  the United States, has extremely exhibited red flags that must

11  be addressed.  That would be our alternative suggestion to the

12  Court to order in this circumstance.

13         THE COURT:  All right.  Attorney Zatko.

14         MR. ZATKO:  Thank you, sir.

15         Your Honor, to address the psychological evaluation

16  question, when Mr. Dunbar was arrested by the state

17  authorities on September 9th, he was immediately taken to

18  Conemaugh Hospital and he was subjected to a psychological

19  evaluation, or a psychiatric evaluation by the psych unit at

20  Conemaugh to determine if, in fact, he could be detained under

21  a Section 302 finding.

22         The doctor found that Mr. Dunbar did not pose a

23  threat to himself or others upon his arrest on September 9th,

24  2017.

25         Your Honor, to address 3142(g) factors, first, with

 1  respect to the nature and characteristics of the offense

 2  charged, I think everyone has to recognize that what

 3  Mr. Dunbar is being charged with is making a statement.  He is

 4  not being charged or it's not alleged that he took any

 5  affirmative steps to carry out the threat.

 6          Mr. Dunbar's own words, if you look at the Supreme

 7  Court's holding in *Watts v. U.S.*, Mr. Dunbar's own words are a

 8  conditional statement.  "If something happens then I would

 9  harm the president."

10          *Watts v. U.S.* squarely addressed that, and they

11  said a conditional statement is not a -- it's not an

12  established threat that would find someone guilty of 18871.

13  So we have  statements of three ear-witnesses, but we also

14  have Mr. Dunbar's statements that the government is intending

15  to show that he admitted to making these threats.  Well, quite

16  frankly, I don't think that his statements even remotely come

17  close to establishing that threat.

18          But taking it one step further; when you look at

19  the factors that the Court is to consider, Mr. Dunbar's

20  character.  He's 22 years old.  He's been a soldier in the

21  National Guard for approximately four years.  He was a

22  distinguished honor graduate from advanced training.  He

23  received an Army achievement metal.  He recently graduated

24  from a reclassification school to be a refueler at the base.

25          His physical and mental condition, we've heard

1   testimony about Mr. Dunbar's threat to himself in June.  The

2   guidelines don't consider threats to yourself as a reason to

3   detain someone.

4          We haven't heard any witnesses here today to

5   specifically say to us, "Dunbar has threatened me, Dunbar has

6   threatened to retaliate against me."  Even the witness who

7   turned him in to his chain of command for the suicidal

8   statement, that's one of our three witnesses in this case.

9   It's the same person.  Mr. Dunbar didn't retaliate against

10  that person for turning him into the chain of command and

11  having his weapon taken away, so why would we believe that he

12  would retaliate against that witness now.

13         More importantly, the max sentence in this case is

14  five years.  If he retaliates or he threatens someone he's

15  facing a much, much, much more serious sentence than he's

16  facing on the charge before this Court today.

17         He has strong family ties to the community.  His

18  grandparents, Roger and Ruth Most, are in the courtroom today.

19  They have indicated to pretrial services that William will

20  reside with them should he be released.

21         William has a job at TJ Maxx in Cumberland,

22  although he's been -- or he had a job.  He's been incarcerated

23  since September 10th.  I can't represent to the Court whether

24  or not he still has that job.

25         His financial resources are minimal.  The pretrial

1    report seems to indicate his net worth is somewhere about

2    $4,500.  So I think any notion that he's going to put together

3    a pile of cash and take off is easily discounted.

4            He's lived in the community his entire life.  He

5    went to high school at three Somerset County high schools.

6    His siblings are in Somerset County.

7            His prior record, Your Honor, is minimal at best.

8    He has a misdemeanor juvenile delinquent charge, and he has

9    two summary convictions.

10           We've heard descriptions of this monster-type

11   individual, this volcanic personality that everyone's afraid

12   of and no one wants around, and they know he's going to do

13   these horrible things, why doesn't his record speak to that?

14   Why haven't we seen, even if there were findings of not guilty

15   or there were plea bargains, why don't we see a record

16   consistent with someone of the behavior that the government

17   wants to submit Mr. Dunbar exhibits.

18           He's appeared at all former court proceedings.  We

19   have reviewed the pretrial services report.  We concur with

20   the assessment that he be released, that Mr. Dunbar be

21   released on an unsecured bond with conditions.  Judge Pesto

22   had added an additional condition of home confinement.  Quite

23   frankly, Your Honor, we don't object to that.  If Your Honor

24   believes that home confinement will assure the safety that the

25   government suggests needs assured, we don't object to that.

1      His weapons have been taken.  He voluntarily

2   disclosed where the weapons were.  There weren't weapons

3   hidden.  There weren't additional weapons.  There weren't

4   illegal weapons.  There weren't stolen weapons.  He has done

5   everything asked of him since his arrest.

6      I would submit that the government has not met its

7   burden to prove that he would be a danger or a threat to the

8   community, and we respectfully request that you would follow

9   the recommendations as set forth by pretrial services.

10      Thank you, sir.

11      THE COURT:  Attorney Haines, any response?

12      MS. HAINES:  Just briefly, Your Honor.

13      The release by Conemaugh on the night it happened,

14   I have not read that report.  I have no idea what they did,

15   what they said, what the response was.  However, obviously,

16   that brief interlude that Conemaugh Hospital had with

17   Mr. Dunbar on that evening versus the investigation to date

18   has, obviously, shed a lot more light on who Mr. Dunbar is and

19   what his past characteristics and behaviors are, which is the

20   suggestion of the United States to do the immediate

21   psychological eval by federal selected authorities.

22      Also, when talking about the nature of the threat

23   and saying, "Well, Mr. Dunbar said it was a conditional

24   threat."  Well, you heard Mr. Dunbar gave three different sort

25   of recitations of what he said or didn't say.  We have three

1  concrete witnesses who do not say it was in any sense of the

2  word they were conditional threats.  They were direct threats

3  we're talking about.

4         And the final point the United States would like to

5  make is the defense wants to rely on or somehow equate the

6  fact that a soldier coming forward and letting the chain of

7  command know that another soldier is potentially going to harm

8  themselves, and that no retaliation occurred against that

9  soldier, is somehow or could somehow also equate to no

10  retaliation at this point.

11         That does not even come close to an analogy that

12  can be made.  There is no way to argue that because somebody

13  wasn't retaliated against because they came forward to help

14  and possibly save the life of someone threatening suicide,

15  would not be retaliated against when this same concerned

16  soldier came forth and brought forth evidence that has

17  resulted in these federal charges.

18         So to use that as a basis why he didn't retaliate

19  in the past when someone said he was going to kill himself, he

20  surely probably wouldn't retaliate now, you heard direct

21  evidence from multiple witnesses, military community and

22  otherwise, who are in fear of retaliation from this defendant

23  based on his past.  That is why we ask for him to be detained

24  or in the alternative the immediate psych evaluation.

25         MR. ZATKO:  Nothing additional, sir.

1          THE COURT:  I direct the court reporter to prepare

2   an official transcript of this proceeding, and I assess the

3   costs of that transcript on the United States.

4          I take the issue of pretrial detention or pretrial

5   release under advisement, and I will issue a decision before

6   the end of this week.  I do want to consider this additionally

7   at this time, based on what the testimony was today.  In

8   reaching that decision, I will be considering the factors set

9   forth in 18 United States Code, Section 3142(g).

10          Pending the decision which, as I said, should be

11   issued by the end of this week, the defendant shall remain

12   detained and the United States Marshal Service shall take

13   custody of the defendant pending additional order of Court.

14          This hearing is in recess until call of Court.

15          (Proceedings concluded at 3:15 p.m.)

16                         *  *  *

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OFFICIAL REPORTER


        I, Kimberly K. Spangler, Federal Official Court
Reporter, in and for the United States District Court for the
Western District of Pennsylvania, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that
the foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter, and that the transcript page format is
in conformance with the regulations of the Judicial Conference
of the United States.

                    Dated this ____ day of _____ 2017


                    _____
                    KIMBERLY RUSHLOW SPANGLER, RPR, RMR
                    FEDERAL OFFICIAL COURT REPORTER